Catron, Ch. J,
delivered the opinion of the court.
1. For the defendant in error, it is suggested, no writ error'lies from the decree of the chancery court, but only an appeal.
By the act of 1S01, ch. 6, sec. 42, 43, 44 and 45, the pleadings, consisting of bill, answers, pleas, demurrers, replications, issues of fact, verdicts thereon, and decrees, are ordered to be recorded. By the 42d section, the orders taken in the cause are to be regularly entered upon the order book each day, signed by the judge, and become a part of the record. It follows, in this State, that proceedings in equity are matters of record on which error will lie, unless some statute prohibits it. From 1809 to 1819, relief by writ of error alone could be had from an erroneous decree by the circuit court. The act of 1819, ch. 31, first provided for an appeal. It did not affect the jurisdiction of the court by writ of error.
In 1822, ch. 13, chancery courts were established, to be holden by the judges of the supreme court as chancellors; theretofore, the supreme court had original chancery jurisdiction. The 4th section provides, that it should not thereafter have original jurisdiction in causes at law or in equity, but appeals and writs of error shall lie from the courts of law and equity. The act of 1824, ch. 14, further regulated the courts, and the 4th section gives this court power to make rules for the bringing up of causes. At the term of the court at Nashville, January 1S25, new rules were adopted, and by the 6th rule, it is directed how the record shall be made up in cases of writs of error, from the chancery court. That same year such writs of error were allowed, and have been allowed ever since. This matter of jurisdiction is not open to controversy, and is only stated at the request of the bar, so that it may be reported.
2. The plaintiffs in error insist, the court had no jurisdiction to decree against John Terrill, because he was *85 not served with process within the chancery district. He was served with a subpoena in chancery, but m the county of Weakley. The University of North Carolina appeared, and defended by agreeing this cause should await the event of that of Ivey against the University and Pinson, in the same court. The bill was taken for confessed against all the parties, and a decree had. The bill does not state where the defendants resided, it having been filed before the adoption of the rules in 1825, the 10th of which requires the complainant to state the residence of the parties. The defendant, Terrill, does not plead in abatement, and it may well be, he resided within the jurisdiction when the bill was filed, but removed from it before service. But the University appeared. This was equal to service of a subpoena within the jurisdiction. The court having power over one defendant, of course has jurisdiction of all other material parties, no difference in what part of the State they reside; were it not so, justice would be defeated in most cases for want of parties necessary to a final decree. To this effect the practice has been uniform, in all transitory causes where a defendant is subject to be sued wherever he may be found. 1 Bibb’s Rep. 410. The land lay within the jurisdiction of the chancery court at Columbia when the bill was filed, but the court will not now enquire whether the cause of action was local and affected the land rather than the person of the defendants, as in cases of dower, partition, &c. Taking it to be transitory, and the decree subject to be executed where the person of the defendant was fouud, as contended for on behalf of the plaintiffs in error, and still there is nothing in the objection.
3. It is contended, that the act of 1782, ch. 3, sec. 6, never could have intended to provide a permanent reward in land, a home and fireside for a slave incapable of holding property, without a will of his own, and who from his political and moral condition, it was impossible to reward. This argument has great force in it, but it is addressed to *86 us in vain. The board of commissioners of North Carolina has construed the act of 1782, and adjudged that negro Frederick, for his services as a musician in theconti-nentalline, was entitled to one thousand acres of land.
By the act of 1804, ch. 14, North Carolina reserved the exclusive right of issuing military warrants, although Tennessee was entrusted with power to cause them to be located. As between the soldier and North Carolina, acting as a sovereign power through her commissioners, the adjudication that Frederick was entitled is conclusive. Pinson and Harkins vs. Ivey, 1 Yerger, 303, 328, 346 and 350. So far, all the judges concurred in Ivey and Pinson, and which conclusion is supported by the decision of the supreme court of the United States, in Comegys vs. Vasse, 1 Peters’ Rep. 201.
4. Was Col. Patton entitled to the warrant issued for the services of his slave? In Pinson and Ivey it was adjudged, that North Carolina held the military lands in trust for the true owners: to bestow them on others, was an act in violation of the trust, subject to be set aside by the ordinary tribunals of justice, notwithstanding the sentence of the board of commissioners of that State. Frederick, the slave of Col. Patton, earned this warrant as a musician in the continental line. What is earned by the slave belongs to the master, by the common law, the civil law, and the recognized rules of property, in the slave-holding states of this Union. Co. Litt. 117, and Hargrave’s note: Cooper’s Justinian, 411: 1 Tucker’s Blackstone, part 2, appendix 55.
North Carolina held as trustee for Col. Patton, and after his death for his heir, Mrs. Cambreling. John Terrill having purchased an equitable title, is subject to the same equities of his vendor, as was adjudged in Ivey and Pinson, and is the settled law of the courts of chancery. Craig vs. Leiper, 2 Yerger’s Rep. 193: Owen’s heirs vs. Stubblefield and others, Sparta, 1833. The decree will be affirmed with costs.
Decree affirmed.
*87 After the above opinion was delivered, W. Thompson filed the following petition to rehear said cause:
The counsel for the plaintiff in error, believing (with all due deference to the opinion of the court) that the merits of this cause are with their clients, respectfully petition the honorable court for a rehearing of the cause. As the cases of Pinson and Harkins vs. Ivey, decided by this court, and that of Comegys and others vs. Vasse, (1 Peters’ Rep. 201,) were relied on by the counsel on the opposing sides in this cause, each relying on the principles established by them as operating in favor of their respective clients; and as this honorable court have cited those decisions to sustain the opinion they have given against the plaintiffs in error, it will be necessary to turn our attention to those cases, and ascertain what has been clearly and decisively settled by them. In the case of Pinson and Harkins vs. Ivey, reported in 1 Yerg. 296, it is known that the court differed in opinion and that the Chief Justice was overruled by the opinion of Judges Whyte and Smith. The Chief Justice assumed the ground, that the judgment of the commissioners was in the nature of an adjudication in rem, in prize courts, and like unto the decisions of the court of exchequer in England, in cases of forfeitures, for treasons, felonies or violation of the revenue law, &c. and that all persons were concluded by if, and at page 341 he says, the extraneous facts to be enquired into (speaking of the commissioners) were “1st, the identity of the claimant, whether the person applying was the same whose name appeared upon the muster rolls, or 2d, his heir, or 3d, his assignee.” The other two judges were of opinion that the powers of the commissioners, rightfully exercised, were much short of those conceded to them by the Chief Justice;,and that as far as they undertook to decide upon the identity of the person entitled, and the rights of conflicting claimants, it was an excess of power, and their judgment void. *88 And the opinion of a maiority of the court was, that the commissioners had a right to decide upon the validity ot the warrant and the quantity of land it included, but not upon the rights of the parties to the land. The Chief Justice in his opinion, while arguing and citing authorities to sustain the position he took, answers the argument which had been pressed upon him, “that the commissioners only decided on the validity of the claim, and not upon the identity of the claimant and the conflicting rights of different claimants;” and at the same time noticed the authority of Comegys vs. Vasse, which was read to sustain the argument. And in noticing the argument and authority, he says: “We have been referred to the opinion of the supreme court of the United Stales, in the case of Comegys and others vs. Vasse, (1 Pet. Rep. 201) as deciding the principle that the order of the commissioners of North Carolina, was not binding upon the right of litigant parties before this court. That cause arose upon the claim to the money adjudged to be due from Spain to American citizens under the treaty of 1819, between Spain and the United States. The latter government agreed with the former, in consideration of the cession of the Floridas to us, that we would pay to American citizens a sum not exceeding five millions of dollars, for and on behalf of Spain, for property unlawfully seized and condemned by that power. By the 11th article of the treaty, jthe President of the United States was authorized to appoint three commissioners to ascertain the claims against Spain, and certify their respective amounts to the treasury department of the United States for payment. As to the validity of the claim against Spain and its true amount, the judgment of the commissioners was conclusive, but they had no power to try the question of private right between the two adverse claimants to the property; this was left to the ordinary judicial tribunals. Such is the decision referred to upon the construction of the treaty, which is too plain to be *89 susceptible of a doubt upon the point of jurisdiction. Far different were the duties of the North Carolina commissioners from those under the Spanish treaty. The latter fixed the validity and amount of the claim, and there left it. This was certain in the instance of a land warrant; the muster rolls had fixed it beyond controversy; they were conclusive upon the validity and amount of the claim. The main business of the commissioners was to ascertain the identity of the individual entitled, from proofs extrinsic of the record.”
The other judges differed from his honor as to the power of the North Carolina commissioners; their right to ascertain the identity of the individual entitled from proofs extrinsic of the record; and the conclusiveness of their judgment.
And hence, Judge Smith (who was appointed after the disagreement in the opinions of Judges Catron and Whyte) cites the case of Comegys and others vs. Vasse, to sustain him in the ground he took, “that the commissioners had not the power to decide in relation to the identity of the individual entitled from proofs extrinsic of the records;” and at page 305 of 1st Yerger, he says: “Accordingly, we find that neither the secretary in the first two acts, nor the commissioners in the third, have power given them to compel the attendance of parties to litigate conflicting interests, or to summon witnesses to investigate such interests, and, as was remarked in the case of Comegys and others vs. Vasse, by Mr. Justice Johnson, “it cannot be presumed it was the intention of government to clothe them with an authority so summary and conclusive, with means so little adapted to the attainment of the ends of substantial justice.” 1 Peters’ Rep. 212. “I consider the acts as mainly designed to ascertain the amount and validity of each land warrant, leaving the right to it to be settled in the ordinary courts, according to established law in each particular case, and therefore, that according to the terms of the act itself, *90 the commissioners bad no iudicial authority to decide on confliction of claims to any particular warrant.
To decide on the amount and validity of the demand under the Spanish treaty, was the power given to the commissioners, and not the identity of the individual entitled to that claim, is conceded by both Judges Catron and Smith, in the opinions delivered by them in the case of Ivey and Pinson, according to the decision in Comegys vs. Vasse.
The commissioners under the Spanish treaty had to decide on the character of the claim, and not the identity of the claimant, as both the judges decide. Far different, says, substantially, the Chief Justice, is the case of the North Carolina Commissioners. They were to decide not so much the validity and amount of the claims, (for the muster rolls showed them) as upon the identity of the person entitled, and the rights of the adverse claimants. Of the same nature as the powers of the commissioners under the Spanish treaty, says Judge Smith, were the powers of the North Carolina commissioners, simply to fix the validity and amount of the claim, and leave to adverse claimants to establish their conflicting rights.— And hence the majority of the court in the case of Pinson and Ivey, determined that the commissioners of North Carolina, when they decided that certain lands were due for. the service of David Ivey, acted within the sphere of their legitimate power, but that when they went on to identify him and decide that he died without heir or as-signee, it was an excess of power. In the case now under consideration, the court says, that "As between the soldier and North Carolina, acting as a sovereign power through her commissioners, the adjudication that Frederick was entitled, is conclusive. 1 Yerg. 303, 328, 346, 350. So far, all the judges concurred in Ivey and Pinson, and which conclusion is supported by the decision of the supreme court of the United States, in Comegys vs. Vasse., 1 Pet. 201.”
*91 In the above paragraph, we do not understand the court as meaning to say any thing more than the commissioners said on the face of the warrant itself, “for the service of negro Frederick, a musician of the line aforesaid, in the revolutionary war,” (who died in the service of the United States, without issue or heir therein.) We cannot understand the court as meaning to say more than this in the paragraph above, for they cite the case of Pinson and Ivey, and state that “so far all the judges agreed.” The extent of the agreement of all the Judges, was, that the commissioners of North Carolina had fixed the amount and validity of the claim by which all parties were concluded;-and tliat this is the way the court understand the extent of the decision in the case of Pinson and Ivey, is conclusively shown by their citation of the case of Comegys and others vs. Vasse, which Judge Catron, in the case of Pinson and Ivey, shows by the opinion of the court in that case, was the extent of the powers of the commissioners under the Spanish treaty, and their appointment in pursuance thereof, to wit, to fix the amount and validity of the claim, and there leave itj'not to decide upon the identity of the claimant or in any way upon adversary conflicting rights to the claim allowed; and contending that this was all the commissioners could lawfully decide under the Spanish treaty. Judge Smith, in his opinion in Pinson and Ivey, decides that the case of the soldier is like unto that, and his identity had not been, and could not have been decided on by the commissioners.
Believing, then, that we have settled in the foregoing consideration, the legitimate powers of the commissioners of North Carolina, as agreed on by the court in the case of Pinson and Ivey; for a moment let us consider the nature of the application made to them by the University, under the act of 1819, giving them their powers.
She says, that by the laws of North Carolina, where a soldier has died without heirs or assignees of his claim, *92 the warrant is to issue to us. Here is the muster roll, showing that negro Jb redenck, a musician, is entitled to 0ne thousand acres ofland, and here is the deposition of Benjamin Robinson, taken according to the act of the North Carolina Legislature, proving that Frederick (a drummer according to the muster roll) died without heirs or relations. The commissioners, therefore, adjudged that the claim for the one thousand acres was valid, and so far it is conceded on all hands, their judgment is conclusive. They went on further, and decided that negro Frederick died without heirs, and therefore the University was entitled to the warrant. This the court have decided was an excess of power. We then most respectfully ask, how it is that the board of commissioners ever construed the act of 1782 to extend to slaves? The honorable court say in considering our construction of the act of 1782, “it is contended that the act of 1782, ch. 3, sec. 6, never could have intended to provide a permanent reward in land, a house and fireside for a slave inca-ple of holding property, without a will of his own, who, from his political and moral condition, it was impossible to reward. This argument has great force in it, but it is addressed to us in vain. The board of commissioners of North Carolina, has construed the act of 1782, and adjudged that negro Frederick, for his services as a musician in the continental line, was entitled to one thousand acres of land. As between the soldier and North Carolina, acting as a sovereign power through her commissioners, the adjudication that Frederick was entitled, is conclusive. Pinson and Harkins vs. Ivey, 1 Yerg. 303, 328, 346, 350. So far all the judges concurred in Ivey and Pinson, and which conclusion is supported by the decision of the supreme court of the United States in Comegys vs. Vasse, 1 Peters, 201.”
The board of commissioners decided upon the validity and amount of the claim of negro Frederick, but not upon his identity; for that position of the Chief Justice *93 in Pinson and Ivey, the majority of the court overruled, and settled, as we have shown, that the commissioners, like those under the Spanish treaty, only decided on the validity and amount of the claim, and not the identity and right of conflicting claimants.
The commissioners never did then decide that Frederick was a slave. But we learn in the exercise of their power’, that they did in fact decide that he was a free man. For they seemed never once to have entertained the idea that he might be a slave, but considered him throughout the whole application for the warrant as a free man, and hence received the testimony of Benjamin Robinson, under the act of 1819, to prove he died without heirs or relations. If the act of 1782 applied to free men only, and the board of commissioners have said that negro Frederick was entitled, is that not deciding directly and conclusively, that Frederick was a free man?
Here is the fallacy, if your honors please, as we conceive, in the argument of the counsel for the appellees. They blend the allegation in their bill that negro Frederick was their slave, with the decision of ihe commissioners that negro Frederick, a musician, (not their slave) was entitled to one thousand acres of land, and therefore they conclude and contend, that the commissioners construed the act of 1782 to apply to slaves, and to their slave Frederick. They say, Frederick was our slave. The commissioners decided that Frederick was entitled to the warrant, ergo, they decided that our slave was entitled.
This conclusion we believe is warranted by neither sound law nor logic. They take for granted in the first proposition, that the Frederick, for whose services the warrant issued, was their slave; the very point in dispute. It is begging the question.
We believe this to be the true and logical statement of the argument. The board of commissioners had the power under the law to award the warrant for the servi *94 ces of free men; they awarded it for the services of Frederick, therefore Frederick was a free man. And the complainant is estopped to deny it. The bill being taken for confessed, cannot put the case in a better attitude for the complainant, than if it had been tried on demurrer.
The bill states facts which are not alleged nor presumed to be in the knowledge, &c. of the defendants, and though taken for confessed, the complainant conceived himself bound to take depositions to prove them. Her own depositions show that Col. Patton’s slave was his waiter, and therefore not Frederick the musician, and hence on the facts the decree was erroneous.
Every thing is consistent in the construction we put on the act of 1782, and the judgment of the commissioners harmonizes with the evidence of the complainant herself. The law authorized them to issue warrants for the service of free men; and believing negro Frederick, the musician, to be a free man, issued it for his service and complied with the law; here is consistency. But complainant comes forward and proves that her father’s waiter was named Frederick, and served in the war, and being a slave, her father was entitled to his warrant as she contends. Here, she is opposing both the opinion of the commissioners in issuing the warrant on a fair construction of the law, and also the facts on which they issued it, apparent on the muster rolls; contending that a waiter and a musician was the same office. We have the facts showing that the commissioners considered Frederick to be a free man, and that he died without heirs, never dreaming about his dying without a master, as such a question could not be involved. But if there were no facts showing how they construed the law, we would presume they construed it correctly, and that they followed the correct construction, and issued the warrant for a free negro named Frederick, a musician, which being a decision upon the claim within their powers, *95 concludes the complainant, and she cannot gainsay it, but is estopped, and a demurrer to her bill would have been sustained.
Peck, J.
"We have given to the petition to rehear, filed in this case, all the consideration the importance of the subject demands. The question was new, and from the first the court felt the weight of it. The argument on the ground assumed is able, and not without plausibility. But we think it a full answer to say that it must be permitted North Carolina, under her statutes and policy, to settle who were her officers and soldiers in the revolutionary war. This right she has reserved to herself; and having settled the question as to the person entitled, we have not the power to gainsay it so long as the obligation rests upon us as agents, to satisfy the warrants she may issue. North Carolina having determined that this negro was a soldier entitled for his services, and having issued the evidence of claim, the duty under the bill filed devolved upon this court to settle the rights between the University and Mrs. Cambreling, the complainant. This we have done upon the pleadings and evidence, and on review can find nothing in the matter advanced which could induce a change of our views as before expressed.
Catron, Green and Whyte, Justices, concurred.
Petition dismissed.